1  JAMES A. DiBOISE, State Bar No. 083296
   ELIZABETH M. SAUNDERS, State Bar No. 138249
2  ALEXANDER MACGILLIVRAY, State Bar No. 212770
   WILSON SONSINI GOODRICH & ROSATI
3  Professional Corporation
   650 Page Mill Road
4  Palo Alto, CA 94304-1050
   Telephone:  (650) 493-9300
5  Facsimile:   (650) 565-5100

6  Attorneys for Plaintiffs
   GROUPE CANAL+ S.A.,
7  CANAL+ TECHNOLOGIES, S.A. and
   CANAL+ TECHNOLOGIES, INC.

8

9                UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11

12

13  GROUPE CANAL+ S.A., CANAL+          )  CASE NO.:  C02-01178 VRW
    TECHNOLOGIES, S.A., CANAL+          )
14  TECHNOLOGIES, INC.,                 )  **FIRST AMENDED COMPLAINT
                                        )  FOR UNFAIR COMPETITION,
15           Plaintiffs,                )  COPYRIGHT INFRINGEMENT,
                                        )  VIOLATION OF THE DIGITAL
16      v.                              )  MILLENIUM COPYRIGHT ACT,
                                        )  TORTIOUS INTERFERENCE
17  NDS GROUP PLC, NDS AMERICAS, INC.,  )  WITH CONTRACT, TORTIOUS
                                        )  INTERFERENCE WITH
18           Defendants.                )  PROSPECTIVE ECONOMIC
                                        )  ADVANTAGE, CONSPIRACY,
19                                      )  VIOLATION OF THE RACKETEER
                                        )  INFLUENCED AND CORRUPT
20                                      )  ORGANIZATIONS ACT AND
                                        )  VIOLATION OF THE
21                                      )  COMMUNICATIONS ACT**
                                        )
22                                      )  **JURY TRIAL DEMANDED**
                                        )
23  _____  )

24
         Plaintiffs Groupe Canal+ S.A. ("Groupe Canal+"), Canal+ Technologies S.A. ("C+
25
    Technologies") and Canal+ Technologies, Inc. ("Canal+ USA") (Plaintiffs collectively referred
26
    to as "Canal+" or "Plaintiffs") allege on personal knowledge as to their own acts and on
27
    information and belief as to the acts of others:
28

1.  Canal+ seeks redress in this action for the damage caused by its competitor, NDS. Through the calculated expenditure of millions of dollars for specialized equipment and other resources, NDS sabotaged C+ Technologies' previously unbroken security system for access to digital television signals. In apparent disregard for both the law and its own reputation, NDS caused the development of counterfeit "smart cards", permitting a theft of digital television on a massive scale. Canal+ estimates that Defendants' illegal conduct has caused it harm in excess of $1,000,000,000.

2.  C+ Technologies designs and sells systems used by pay television operators around the world to control access to their copyrighted and proprietary broadcast signals. The safety of those signals depends upon the security schemes adopted and implemented by Canal+. Digital television providers and content providers fear the unauthorized interception of the digital television signal because it deprives them of revenue, increases the costs to paying customers and may permit the unauthorized digital copying of copyrighted works for illegal distribution. Canal+ has implemented some of the strongest security measures that exist today in its smart cards used to control access to digital television signals. Until the events described in this complaint, Canal+'s security measures to protect and control access to digital television signals had not been circumvented and its systems had not been cracked or counterfeited.

3.  Published papers on the protection of access to scrambled digital television signals suggest that extremely secure methods of protecting access to such signals can be achieved at an appropriate price from all but the most sophisticated and well-funded efforts. Indeed, Canal+'s security measures were more than adequate until March 1999 when its smart card software code was copied and published on a web site called "DR7.com." After the publication of that code, counterfeit Canal+ smart cards began to appear in the market. Since the appearance of these counterfeit cards, Canal+ established that the publication of the Canal+ code on the DR7 website has permitted counterfeiters to emulate or evade the security measures built into the smart cards. The ability to circumvent these technological security measures spawned a

proliferation of the supply of counterfeit Canal+ smart cards and the existence of these cards has caused great damage to Canal+ and the system operators who depend on its services.

4.     After the publication of its software code on the DR7 website, Canal+ spent time trying to determine how its code was stolen and who did it. Shockingly, Canal+'s investigation led it to NDS. NDS devoted its substantial corporate resources to sabotage C+ Technologies' technological security measures engineered into its smart cards – a sophisticated and well-funded effort that does not exist at the level of fly by night operators selling counterfeit cards at news kiosks and over the Internet.

5.     Competition should be about fair contests for customers, not "cloak and dagger" operations aimed at undermining a competitor's products and services. NDS's actions undermine fair competition and endanger the future of digital television. By this action, Canal+ seeks compensation for these wrongs and to stop NDS from similar sabotage in the future.

**THE PARTIES**

6.     Groupe Canal+ S.A. is a corporation existing under the laws of France, with its principal place of business in Paris, France. Groupe Canal+ is a media company that produces films and television programming. Groupe Canal+ is the leading European producer of pay television premium and sports/entertainment channels broadcast in 11 countries. Groupe Canal+ is also the leading European pay television operator.

7.     Canal+ Technologies S.A. is a corporation existing under the laws of France, with its principal place of business in Paris, France. C+ Technologies is one of the world's leading providers of advanced software technologies that enable television network operators to deliver secure programs and interactive services over digital television networks through set-top boxes. These products include conditional access technology on cards that contain highly specialized microchips with advanced software and encryption algorithms. These cards, commonly referred to as "smart cards," limit access to digital pay television programs to lawful subscribers who pay for it.

8.     Canal+ Technologies, Inc. is a corporation existing under the laws of the State of California, with its principal place of business in Cupertino, California. Canal+ USA sells and

markets C+ Technologies' conditional access software in the United States.

9.    Defendant NDS Group plc ("NDS") is a corporation existing under the laws of the United Kingdom with its principal place of business in Staines, Middlesex, United Kingdom. NDS is a supplier of conditional access software and interactive systems on smart cards for the secure delivery of entertainment and information to television set-top boxes. NDS directly competes with Canal+ in this market.

10.    Defendant NDS Americas, Inc. ("NDS Americas") is a corporation existing under the laws of Delaware with its principal place of business in Newport Beach, California. NDS Americas performs sales, customer support, marketing functions and smart card processing for NDS. NDS Americas and NDS representatives undertook significant acts in California to perpetrate the harm described herein and but for those actions the harm caused to Canal+ would not have occurred.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §§ 1331 and 1338 due to the claims brought pursuant to 17 U.S.C. §§ 101 *et seq.* and 18 U.S.C §§ 1962(a), (c) and (d). This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

12.    Personal jurisdiction and venue in this Court are proper pursuant to 28 U.S.C. §§ 1391 and 1400 and 18 U.S.C § 1965 because defendants transact business in this District, are found in this District and/or directed conduct at this forum.

## FACTUAL BACKGROUND

### C+ Technologies' Smart Card Technology

13.    Even with the rise of the Internet, the television remains the most common and widely used source of information and entertainment in the world today. Due to the popularity of television worldwide, the television industry has constantly looked for ways to improve the viewer's experience. Canal+ is at the forefront of these efforts. In recent years, Canal+ has focused on developing and providing digital interactive television.

14.     Using compression techniques and other technological advances, digital television allows network operators to deliver more channels, better picture quality, improved security and a wide range of interactive services that are unavailable over television using traditional analog signals.  To introduce the advances of digital technology to the analog television sets most consumers own today, television network operators deploy digital set-top boxes, as well as smart cards to be used with them, that convert the incoming digital television signal to an analog signal that the television can process and display.  The performance and security of digital set-top boxes with smart cards are critical competitive factors in the digital broadcast industry.

15.     C+ Technologies sold its first systems of advanced software technologies to enable and secure digital interactive television through set-top boxes in 1996.  These systems are found in two basic products.  C+ Technologies' MediaHighway interactivity software enables network operators to enhance the television viewing experience with an extensive range of interactive services.  C+ Technologies' MediaGuard conditional access software enables network operators to manage and control delivery of pay television content and provides a secure platform for interactive transactions.  ("Conditional access" is the term used to describe products that control and secure access to digital television signals.)  The MediaHighway and MediaGuard software systems can be implemented together or separately in combination with software from other providers.  The MediaGuard conditional access product is at the center of this controversy.

16.     Digital pay television broadcasts are encrypted to control access to the digital content so that only customers who properly pay for digital television can view the offered programs.  This payment is particularly crucial because digital pay television content, like cable content, is very often provided without commercials, and the revenue associated with it comes from subscribers.  A key component in C+ Technologies' MediaGuard conditional access system is its smart card.  A smart card, inserted into a subscriber's set-top box, deciphers access messages and provides the deciphering keys needed by the set-top box to descramble the broadcast stream.  If the smart card authorizes viewing, it provides the set-top box with the keys necessary to descramble the digital television content. This fundamental encryption/decryption software is meant to ensure digital television delivery only to those entitled to receive it.

17.     C+ Technologies has spent over $35 million developing its MediaGuard conditional access product.  The MediaGuard product consists of a software suite run by the television network operator on its originating server, software embedded in set top boxes, and MediaGuard smart cards which are inserted into set top boxes to decipher digital television signals.  The software for the MediaGuard smart cards is produced by C+ Technologies under strict security, and C+ Technologies devotes substantial time, money and effort to protect the confidentiality of the software code it has developed for the microchips on its smart cards.  These efforts include, for example, requiring all C+ Technologies' employees to undertake strict confidentiality obligations, limiting the number of people with access to the software code, restricting access to the manufacturing facilities where the cards are customized, requiring sub-contractors to agree to security measures as stringent as those implemented within C+ Technologies and maintaining the code on a secure stand-alone computer not connected to a network.  C+ Technologies also took extensive measures to protect the code on its smart cards from attack.  Before the events described in this Complaint, C+ Technologies' security measures had never been invaded nor had the security measures used to protect the code on the cards ever been circumvented.

### Smart Card Counterfeiting

18.     Counterfeit digital television smart cards represent a serious threat to the growth of the digital television industry.  Network operators and content providers depend on subscription payments to generate revenues to cover their large costs for broadcasting infrastructure, basic programming and producing content.  Counterfeiting leads to loss of revenue for content providers and to less funds available for development of content and the deployment of new technology.  This leads to reduction in the amount of content provided and higher prices for paying customers.

19.     C+ Technologies invested large sums of money and extensive human resources to protect the design and contents of its smart cards.  For example, C+ Technologies restricted the number of people working on its smart card software code, used only one computer to develop the code, completely isolated that computer from any networks and secured all backups of the

code in a locked safe. Once written to the smart cards, the code was protected by obfuscation methods among the most advanced in the industry. These technical measures were designed to obscure the information on the cards and to resist known methods used by software pirates to access and read the software stored on the cards.

20. From the time the first C+ Technologies smart card was introduced on the market in 1996 until the events described herein, the security and technical measures implemented by C+ Technologies successfully protected C+ Technologies' smart cards. In late 1999, however, counterfeit C+ Technologies smart cards began to emerge on the market and since that time have severely and negatively impacted Canal+'s digital television business. Canal+ recently uncovered evidence that its MediaGuard smart card was subjected to extensive sabotage efforts by NDS that led to the production of the counterfeit C+ Technologies smart cards.

**NDS Cracked C+ Technologies' Smart Cards And Facilitated Counterfeiters**

21. The facts leading up to the widespread dissemination of counterfeit C+ Technologies smart cards reveal an intentional pattern of illegal conduct by NDS with its ultimate aim being extensive damage to Canal+.

22. To accomplish its scheme, NDS obtained C+ Technologies' smart cards and sent them to an NDS laboratory in Israel for analysis. At this facility, NDS had acquired and assembled the costly equipment needed to conduct invasive attacks on smart cards. NDS dedicated a team of software and hardware engineers at this laboratory to a special project – carrying out the invasion of C+ Technologies' smart cards.

23. By the end of 1998 the NDS team in Israel had successfully extracted the software stored on the C+ Technologies smart card through electrical and optical examination of the protected internal software code of the card using expensive machinery designed and operated to defeat C+ Technologies' protective measures. In early 1999, NDS used the results of this invasive attack to download the UserROM software from the smart card. The UserROM is the portion of the memory of a smart card that is necessary to control access to the digital stream. The NDS team also created a digital archive file named "SECAROM.ZIP" containing materials to enable the creation of counterfeit smart cards, including copies of the MediaGuard UserROM

and a file detailing the memory addresses of different components of the MediaGuard smart card.

24.    NDS then took steps to have C+ Technologies' UserROM code and other materials published so that counterfeiters could exploit them to develop counterfeit smart cards and thereby provide NDS with an advantage in securing digital television operator contracts. NDS transmitted the SECAROM.ZIP file to NDS Americas, Inc. in California with instructions that it be published on the Internet so that the C+ Technologies MediaGuard UserROM code and other materials would be freely available to anyone who wanted to use it to produce counterfeit C+ Technologies smart cards. NDS Americas, Inc. transmitted the code from California to Al Menard, the operator of the website known as "DR7.com." On March 26, 1999, DR7 published C+ Technologies' code and related materials on its website.

25.    In late 1999, counterfeit C+ Technologies smart cards began to appear on the market. These cards were produced after publication of the C+ Technologies MediaGuard UserROM and contained a perfect replica of the complex encryption table NDS extracted through its invasive attack and caused to be published on DR7.com. In all cases, the counterfeit cards could not have existed but for the publication of the MediaGuard UserROM on the DR7 website, especially its complex encryption table which is embedded in all counterfeit cards and enables the cards to circumvent the security measures implemented by C+ Technologies.

26.    Through the introduction of and facilitation of the production of counterfeit C+ Technologies smart cards, NDS hoped to drive a wedge between Canal+ and its customers to adversely impact Canal+'s business and promote NDS' own competitive position. NDS' unlawful scheme succeeded. Canal+ has lost subscribers and now faces claims from client television operators for financial compensation and other remedies due to their losses caused by the theft of programming through counterfeit smart cards.

### Harm To Canal+ From NDS's Publication of C+ Technologies Code

27.    C+ Technologies has spent substantial time and money developing countermeasures to combat each type of pirate smart card that resulted from the publication caused by NDS. These countermeasures are created by a team of C+ Technologies engineers

and then tested and broadcast by the digital television operators to stop unlawful television viewing by counterfeit card consumers. The countermeasures, however, are quickly made obsolete by new versions of software for the counterfeit cards that pirates make available after analyzing the countermeasures. Counterfeiters are able to quickly and effectively respond to each new countermeasure because they have access to the UserROM code published on DR7.com. C+ Technologies cannot stop this counterfeiting without implementing a fundamental change in the design of the smart card. At enormous expense, C+ Technologies is currently developing a new smart card design and will soon transition its existing network to the new design. This transition will be time consuming and expensive because each and every legitimate smart card will have to be exchanged.

28. The mass production of counterfeit C+ Technologies smart cards has damaged not only Groupe Canal+'s direct revenue through its digital television operators, but has also hurt the sales efforts of C+ Technologies and Canal+ USA. Conditional access system competitors, especially NDS, use the existence of counterfeit C+ Technologies cards as a competitive weapon in the sales process among content providers and system operators. For example, Canal+ has encountered competitors, including NDS, pointing out to customers and potential customers in the United States and elsewhere throughout the world, the breach of C+ Technologies' security schemes as evidence that Canal+ cannot guarantee the integrity of its systems. In highlighting this supposed security breach, Defendants have deceptively failed to disclose that the breach exists solely because of Defendants' own unlawful sabotage.

29. As a result of the counterfeiting, Canal+ has lost sales opportunities and has lost customers to its competitors. NDS has also used the counterfeiting to attempt to disrupt Canal+'s relationships with existing customers.

30. Another loss occasioned by NDS to Groupe Canal+ is the loss of pay per view subscriptions. One common type of counterfeit access is a modification of a legitimate smart card. These cards, commonly referred to as "MOSC" cards (*i.e.* "Modified Official Smart Cards"), are legitimate cards, sometimes with valid basic subscriptions, that have been altered so they grant their owners rights that they have not purchased. Some MOSC cards grant free access

to upgraded packages or to every subscription channel; others have a number of pay per view television "credits" for which the owner has not paid. These cards did not exist before the publication on DR7.com and but for that publication, they would not have been produced. The widespread use of MOSCs has caused Groupe Canal+ and pay television operators from the Canal+ group to lose revenues from premium programs as subscribers are able to have their smart cards altered to receive premium programs without paying for them.

31. Canal+ has been and continues to be harmed by counterfeit C+ Technologies smart cards in the market. Canal+ has uncovered the origin of the counterfeit cards, and the facts as set forth herein show that NDS and NDS Americas, Inc. are responsible for this harm. To date, the damage to Canal+ from the unlawful acts of Defendants described herein is in excess of $1 billion.

**COUNT I**

**(Unfair Competition, Cal. Bus. & Prof. Code § 17200, *et seq.*)**

32. Plaintiffs repeat and reallege each and every allegation set forth in paragraph 1 through 31.

33. Defendants have engaged in unfair competition in violation of the California Business and Professions Code Sections 17200 *et seq.*, causing injury to Plaintiffs, including Canal+ USA's business, in Santa Clara County and elsewhere throughout California and the world. Defendants willfully, unlawfully, according to a plan, and with the intention of harming Plaintiffs, acquired C+ Technologies' MediaGuard smart cards, hired engineers to teach them how to violate those cards, and acquired expensive equipment to assist them in cracking the smart cards for the purpose of extracting and copying C+ Technologies' proprietary software code. After transferring the code to NDS Americas, Inc. in California, Defendants caused it to be disseminated it over the Internet to facilitate further copying leading to the production of counterfeit C+ Technologies smart cards, all to the detriment of Canal+'s business and its reputation among its customers and in the industry. Defendants engaged in further unlawful conduct through deceptive advertising and promotional activities by highlighting to Plaintiffs' customers and potential customers the supposed security flaws in Plaintiffs' technology while

concealing Defendants' central role in breaching the security of that technology. Defendants have falsely suggested and continue to falsely suggest that the breach of Plaintiffs' security system is the result of a defect in Plaintiffs' manufacture rather than the result of Defendants' campaign of sabotage. This conduct constitutes an unlawful, unfair and fraudulent business act or practice within the meaning of California Business and Professions Code Section 17200 *et seq*.

34. Defendants' invasive attack of C+ Technologies' smart cards, public dissemination of the SECAROM.ZIP file and concealment of their role in this sabotage was intentional and done for the wrongful purpose of inhibiting Plaintiffs' competitive positions in the digital television industry and unfairly benefiting Defendants. As a direct and proximate result of Defendants' violations of California Business and Professions Code Section 17200 *et seq*., Defendants have been unjustly enriched at Plaintiffs' expense. Plaintiffs are entitled to disgorgement of all monies unlawfully earned , and restitution of any and all of Plaintiffs' property (including Plaintiffs' smart cards) unlawfully obtained or possessed by Defendants.

35. As a direct and proximate result of Defendants' violations of California Business and Professions Code Section 17200 *et seq*., Plaintiffs have suffered and will continue to suffer irreparable harm, including but not limited to harm to their business reputations and goodwill. Therefore, Plaintiffs' remedy at law is not adequate. Complete protection of Plaintiffs' rights must include an injunction prohibiting Defendants from taking any steps to contribute to the copying of any C+ Technologies' software code or any steps to reverse engineer or otherwise violate the security measures on any C+ Technologies smart card, as well as all other remedies available.

## COUNT II

### (Common Law Unfair Competition)

36. Plaintiffs repeat and reallege each and every allegation set forth in paragraph 1 through 35.

37. As a result of the conduct described above Defendants have engaged and continue to engage in unfair competition in violation of common law. Defendants' wrongful acts have

directly and proximately harmed Plaintiffs in an amount to be determined at trial. In addition, Plaintiffs' remedy at law is not adequate. Complete protection of Plaintiffs' rights must include an injunction prohibiting Defendants from taking any steps to contribute to the copying of any of C+ Technologies' software code or any steps to reverse engineer or otherwise violate the security measures on any C+ Technologies' smart card, as well as all other remedies available.

## COUNT III

### (Direct Copyright Infringement Solely Against NDS Group – 17 U.S.C. § 101 *et seq.*)

38.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 37.

39.     C+ Technologies' MediaGuard UserROM software code embodies original and creative authorship. C+ Technologies has devoted thousands of engineering-hours to design and develop this software code. The software code, including but not limited to its "MediaGuard UserROM software code for ST Chips," source code and encryption substitution table, contains a substantial amount of wholly original expression and is copyrightable subject matter under the laws of the United States.

40.     C+ Technologies owns or is joint owner of the copyright to the "MediaGuard UserROM software code for ST Chips" at issue in this complaint by virtue of its own creative authorship of the program.

41.     C+ Technologies has complied in all respects with the provisions of 17 U.S.C. Section 101 *et seq.*, and all other laws governing copyright to secure copyright in the "MediaGuard UserROM software code for ST Chips." C+ Technologies application for registration of these copyrights was submitted on February 12, 2002.

42.     C+ Technologies has expended substantial amounts of time and resources for research and development in order to improve and update the "MediaGuard UserROM software code for ST Chips" and it is a substantial source of revenue for C+ Technologies.

43.     NDS has reproduced, prepared a derivative work from, imported and distributed copies of C+ Technologies' MediaGuard UserROM code in the United States and thereby infringed C+ Technologies' copyrights in its MediaGuard smart cards.

44. NDS' direct copyright infringement has been willful.

45. The result of the aforesaid conduct of NDS has been and will continue to be to deprive C+ Technologies of goodwill, to injure C+ Technologies' relationships with its actual prospective customers, and to impose substantial expense on C+ Technologies to counteract the aforesaid conduct. NDS has also been unjustly enriched by its infringement.

46. NDS' conduct has directly and proximately caused damages to C+ Technologies in an amount to be proven at trial. In addition, C+ Technologies' remedy at law is not adequate. Complete protection of C+ Technologies' rights must include an injunction prohibiting NDS from contributing to any acts of copying any C+ Technologies smart card software code, as well as all other remedies available.

## COUNT IV

**(Contributory Copyright Infringement Solely Against NDS Group – 17 U.S.C. § 101 *et seq.*)**

47. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 46.

48. Unauthorized copies of C+ Technologies' MediaGuard UserROM code have been incorporated into counterfeit smart cards in the United States, and such counterfeit cards have been distributed in the United States. The unauthorized copying of the MediaGuard UserROM code and the distribution of counterfeit cards infringed C+ Technologies' copyrights in its MediaGuard smart cards.

49. In creating and distributing the SECAROM.ZIP file, NDS had knowledge of and substantially participated in these infringements of C+ Technologies' copyrights in its MediaGuard smart cards. NDS is thus contributorily liable for this copyright infringement. NDS' contributory copyright infringement has been and continues to be willful.

50. The result of the aforesaid conduct of NDS has been and will continue to be to deprive C+ Technologies of goodwill, to injure C+ Technologies' relationships with its actual prospective customers, and to impose substantial expense on C+ Technologies to counteract the aforesaid conduct. NDS has also been unjustly enriched by its infringement.

51.     NDS' conduct has directly and proximately caused damages to C+ Technologies in an amount to be proven at trial. In addition, C+ Technologies' remedy at law is not adequate. Complete protection of C+ Technologies' rights must include an injunction prohibiting NDS from contributing to any acts of copying C+ Technologies' smart card software code, as well as all other remedies available.

## COUNT V

### (Violation of DMCA – 17 U.S.C. § 1201(a)(2))

52.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 51.

53.     Defendants invaded and attacked C+ Technologies' smart cards and enabled the publication of C+ Technologies' smart card software code specifically to circumvent the protections provided by C+ Technologies in those cards. The counterfeit cards that exist on the market and cause great harm to Plaintiffs were created as a result of a painstaking and entirely unauthorized process of invasive attack of C+ Technologies' smart cards to reveal the card's security measures and create the means to circumvent them.

54.     C+ Technologies' MediaGuard smart cards are technological measures that are part of a deciphering system that effectively controls access to copyrighted works including television programming, movies and other pay per view events.

55.     Defendants produced, imported into the United States, offered to the public, provided and trafficked in a technology, or part thereof, consisting of a ZIP archive named SECAROM.ZIP, a file of Defendants' own creation, containing materials to enable the creation of counterfeit smart cards including copies of the MediaGuard UserROM and a file detailing the memory addresses of different components of the MediaGuard smart card.

56.     Defendants created, designed and produced the SECAROM.ZIP file for the primary purpose of defeating the MediaGuard smart card's access control of copyrighted works, including digital television content.

57.     The SECAROM.ZIP product has no commercially significant purpose or use other than circumventing the MediaGuard smart card's access control of copyrighted works,

including digital television content.  The SECAROM.ZIP product was published on a web site, DR7.com, devoted to circumventing digital television access controls, after it had been supplied by Defendants to the DR7 webmaster.

58.     Defendants' actions violated Section 1201(a)(2) of the Digital Millennium Copyright Act ("DMCA").  Defendants' acts constituting DMCA violations have been and continue to be performed without the permission, license or consent of Plaintiffs.

59.     Defendants' conduct has directly and proximately caused damages to Plaintiffs in an amount to be proven at trial.  In addition, Plaintiffs' remedy at law is not adequate.  Complete protection of Plaintiffs' rights must include an injunction prohibiting Defendants from taking any steps to reverse engineer or otherwise violate the security measures on C+ Technologies' smart cards, as well as all other remedies available.

## COUNT VI

### (Tortious Interference with Contract)

60.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 59.

61.     C+ Technologies has contracts with digital television operators in countries throughout Europe including ITV Digital (previously OnDigital) in the United Kingdom, Sogecable in Spain and Astro Measat in Malaysia.  NDS knew about the existence of these contracts.

62.     Defendants deliberately took the actions set forth in this Complaint, including cracking C+ Technologies' smart carts and facilitating the dissemination of C+ Technologies' code for the primary purpose of disrupting the aforementioned contracts.

63.     C+ Technologies' customers have been harmed by the existence of pirated C+ Technologies smart cards in the market.  Plaintiffs' customers do not receive payment if smart cards that allow access to content without a subscription exist in the market.  Customers are thereby deterred by the existence of counterfeit smart cards from continuing to purchase C+ Technologies' MediaHighway or MediaGuard products and generally from expanding their business relationships with Plaintiffs.

64. To preserve its relationships with these customers, C+ Technologies has been forced to expend  substantial sums to reengineer its security systems. It has also lost prospective add-on sales and been forced to make various concessions to its customers, rendering the contracts less beneficial and more expensive for C+ Technologies.

65. Defendants' wrongful acts have directly and proximately harmed Plaintiffs in an amount to be determined at trial.  Defendants committed these tortious acts with deliberate and actual malice, ill-will, and oppression in conscious disregard of Plaintiffs' legal rights.

**COUNT VII**

**(Tortious Interference with Prospective Economic Advantage)**

66. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 65.

67. Plaintiffs have beneficial economic relationships with customers and partners for pay television services as well as for the MediaGuard system and component smart cards.  These include relationships with MediaOne, Cablevision, RCN, Phillips, DiviCom and C-Cube.  Defendants' sabotage of C+ Technologies' smart cards and highlighting the alleged flaws in C+ Technologies' security to Plaintiffs' existing and potential customers and partners have caused these customers and partners to lose confidence in Canal+.  As a result, Canal+ has lost business to its competitors, including NDS.  For example, when Canal+ lost a contract with Cablevision to NDS, Cablevision informed Canal+ that it chose NDS because of Canal+'s apparent piracy problem.

68. Defendants compete head to head in the same digital broadcast market as Plaintiffs for the same customers.  Defendants are aware of the entities with whom Plaintiffs has these relationships who are likely to purchase services and products from Plaintiffs.  Defendants deliberately took the actions set forth in this Complaint, including cracking C+ Technologies' smart cards and facilitating the dissemination of C+ Technologies' code for the primary purpose of disrupting the aforementioned relationships.

69. To preserve its relationships with these potential customers, C+ Technologies has been forced to expend substantial sums to reengineer its security systems.  It has also been forced

1  to make various concessions that would render relationships with these potential customers less

2  beneficial and more expensive for C+ Technologies.

3       70.     Defendants' wrongful acts have directly and proximately harmed Plaintiffs in an

4  amount to be determined at trial. Defendants committed these tortious acts with deliberate and

5  actual malice, ill-will, and oppression in conscious disregard of Plaintiffs' legal rights.

6  **COUNT VIII**

7  **(Civil Conspiracy)**

8       71.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1

9  through 70.

10       72.     Defendants NDS and NDS Americas knowingly and willfully conspired together

11  and with DR7, Al Menard and third party manufacturers and sellers of counterfeit smart cards to

12  (a) promote the manufacture and public distribution of counterfeit smart cards that allow for the

13  theft of services protected by C+ Technologies' security measures; and (b) undermine public

14  confidence in C+ Technologies' security measures.

15       73.     Defendants NDS and NDS Americas, and later DR7, Al Menard, and third party

16  manufacturers and sellers of counterfeit smart cards, agreed to do and did the unlawful acts and

17  things herein alleged pursuant to and in furtherance of this conspiracy. The principal overt acts in

18  furtherance of the conspiracy were the transport and distribution of C+ Technologies' Media

19  Guard's UserROM code.

20       74.     In addition, Defendants NDS and NDS Americas ratified and adopted the acts of

21  DR7 and Al Menard, the operator of DR7.com, by seeking their participation and assistance in

22  the conspiracy and by facilitating such participation and assistance.

23       75.     The conspiracy remains operative today as entities continue to manufacture and

24  distribute counterfeit smart cards to enable the theft of services protected by C+ Technologies'

25  security measures.

26       76.     As a direct and proximate result of defendants' participation in this conspiracy

27  and wrongful acts in furtherance thereof, Plaintiffs have been damaged in an amount to be

28  proven at trial.

1    77.    Defendants committed these wrongful acts willfully and with the intent to cause

2    injury to Plaintiffs.  Defendants acted with deliberate and actual malice, ill-will and oppression in

3    conscious disregard of Plaintiffs' legal rights.

4                                          **COUNT IX**

5                 **(Violation of 18 U.S.C. §§ 1962 (a), (c), and (d) – RICO)**

6    78.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1

7    through 77.

8    79.    Defendants wrongful conduct constitutes a pattern of "racketeering activity"

9    as defined by 18 USC Section 1961.  Specifically, the defendants have committed at least the

10   following predicate acts:  (i) criminal copyright infringement in violation of 17 U.S.C. Section

11   506(a) and 18 U.S.C. Section 2319; (ii) misconduct in connection with access devices in

12   violation of 18 U.S.C. Section 1029; and (iii) wire fraud in violation of 18 U.S.C Section 1343.

13   80.    Defendants' criminal copyright infringement, in violation of 17 U.S.C. Section

14   506 and 18 U.S.C. Section 2319 is established by Defendants willful infringement of Canal+'s

15   copyrighted work to obtain commercial advantage and financial gain.  Defendants committed

16   this willful infringement by knowingly making and distributing unauthorized copies of the

17   SECAROM.ZIP file.  Defendants made unauthorized copies on at least three occasions: (i) on

18   NDS' mail server located in the United States upon receipt of the email message containing the

19   file or otherwise downloading the file; (ii) on the computer equipment of each individual to

20   whom the file was transferred; and (iii) on an NDS computer for electronic transfer to the

21   operator of DR7.com.  These willful infringements affected and continue to affect interstate and

22   foreign commerce.

23   81.    Defendants also violated 18 U.S.C. Section 1029 which prohibits certain activities

24   regarding "access devices," including any card, code, account number, or other means of

25   accessing an account which can be used to obtain anything of value.

26   82.    Defendants knowingly produced, trafficked in, controlled, and possessed "device

27   making equipment" – that is, any equipment, mechanism or impression designed or primarily

28   used for making an access device or counterfeit access device.  By this conduct, Defendants

intended to deceive and defraud Plaintiffs and their customers through the creation and public distribution of counterfeit smart cards that would falsely indicate that users of the cards were authorized to receive certain digital television programming. Defendants' conduct constitutes a violation of 18 U.S.C. Section 1029(a)(4). Such conduct has affected and continues to affect interstate and foreign commerce.

83. Defendants also violated 18 U.S.C. Section 1029(b)(2) through their participation in a conspiracy with Al Menard, DR7 and manufacturers and sellers of counterfeit smart cards. Parties to this conspiracy (including Defendants) committed, and acted in furtherance of, violations of 18 U.S.C. Section 1029(a)(1-6). The violations that Defendants conspired to commit and acted to further have affected and continue to affect interstate and foreign commerce.

84. Defendants also engaged in wire fraud in violation of 18 U.S.C. Section 1343. Such violation is established by Defendants' transmission, by means of interstate or foreign commerce, of an email or file containing a copy of the file SECAROM.ZIP. Such transmissions were part of Defendants' scheme to deceive and defraud Plaintiffs and their customers through the creation and public distribution of counterfeit smart cards that would falsely indicate that users of the cards were authorized to receive certain digital television programming. Defendants have engaged in wire fraud on at least three occasions: (i) Defendants' transmissions of the file SECAROM.ZIP from NDS Israel to NDS Americas; (ii) Defendants' transmission of the file SECAROM.ZIP from NDS Americas to Al Menard of DR7.com; and (iii) additional telephone and electronic mail communications in furtherance of the fraudulent scheme between NDS Americas, NDS Israel, and/or NDS Group plc, including all electronic mail transmissions of the file SECAROM.ZIP between the time of the transmission from NDS Israel to NDS Americas on one hand and the file's ultimate transmission to Al Menard of DR7.com on the other. Each such electronic transmission was made or caused to be made to execute and further this scheme, and was made or caused to be made with the specific intent to deceive and defraud Plaintiffs and their customers. Defendants' violations of 18 U.S.C. Section 1343 have affected and continue to affect interstate and foreign commerce.

85.     There is a relationship between Defendants' violations of 18 U.S.C Section 2319, 1029 and 1343 as the violations have similar purposes, results, participants, victims, and methods of commission. Defendants' repeated violations of 18 U.S.C. Sections 2319, 1029(b)(2), and 1343 thus amount to a pattern of related criminal and racketeering activity. There is a threat of repetition of such acts, causing further harm to Plaintiffs and their customers and to manufacturers of legitimate smart cards. This threat is particularly serious given the imminent introduction of C+ Technologies' new smart cards and Defendants' enormous investment of time and resources into destroying the security of C+ Technologies' existing conditional access system.

86.     Defendants have received income derived, directly or indirectly, from the pattern of racketeering activity herein alleged, by creating for NDS an unfair competitive advantage, leading to purchases from NDS that would not otherwise have been made. Defendants have used, directly or indirectly, part of such income in the operation of an enterprise, NDS, which is engaged in activities that affect interstate and foreign commerce. Defendants have thus violated 18 U.S.C. Section 1962(a).

87.     Additionally, in 1999 and after, in the state of California and elsewhere, Defendants, along with Al Menard, the operator of DR7.com, were associated in fact with an enterprise engaged in, and the activities of which affected, interstate and foreign commerce. That enterprise was organized, supervised and directed by NDS. Through their participation in the enterprise, Defendants caused the enterprise to acquire and publish the C+ Technologies' Media Guard UserROM code to promote the creation and public distribution of counterfeit smart cards. In violation of 18 U.S.C. Section 1962(c), Defendants directly and indirectly conducted and participated in the conduct of such enterprise's affairs through the pattern of racketeering activity described above.

88.     Defendants violated 18 U.S.C. Section 1962(d) by conspiring to violate 18 U.S.C. Section 1962(a) and (c). Defendants agreed to engage in conduct in violation of 18 U.S.C. Section 1962(a) and (c) and formed, knowingly joined, and operated a conspiracy to engage in such conduct. Each defendant committed and agreed to the commission of two or more of the

1  predicate offenses described above as part of its participation in the affairs of the illicit

2  enterprise.

3      89.    Defendants' conduct in violation of 18 U.S.C. Sections 1962(a), (c), and (d) has

4  directly and proximately caused damages to Plaintiffs in their business and property, including

5  injury to Plaintiffs' ability to compete by reason of the unfair advantage Defendants gained by

6  their racketeering activity, in an amount to be proven at trial.  Pursuant to 18 U.S.C. Section

7  1964(c), Plaintiffs are entitled to treble damages and to the costs of this suit, including Plaintiffs'

8  reasonable attorney's fees.

9                                    **COUNT X**

10                **(Violation of 47 U.S.C. § 605 – Communications Act)**

11      90.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1

12  though 89.

13      91.    Through their attack on the Canal+ Technologies smart card, extraction of the

14  protected internal software of the smart card, transmission of the smart card software in the

15  digital archive file SECAROM.ZIP from Israel to California, and transmission of that file from

16  California to the Canadian website DR7.com, the Defendants assisted in the unauthorized

17  reception of Canal+'s encrypted digital satellite television communications. The Defendants also

18  modified, imported, exported, and distributed a device and/or equipment that is primarily of

19  assistance in the unauthorized decryption of Canal+'s digital satellite television transmissions.

20  These actions violated 47 U.S.C. Section 605.

21      92.    Defendants undertook these actions knowing or having reason to know that the

22  SECAROM.ZIP file was primarily of assistance in the unauthorized decryption of Canal+'s

23  digital satellite television transmissions.  Defendants intended by their actions to facilitate the

24  counterfeiting of Canal+'s smart cards and the unauthorized reception of Canal+'s digital

25  satellite television transmissions, in order to damage Canal+ and to wrongfully better their

26  competitive position in relation to Canal+.

27      93.    Defendants' violations of 47 U.S.C. Section 605 injured and will continue to

28  injure Plaintiffs by, among other things, depriving the Plaintiffs of customer payments for the

1    authorized transmission of Canal+'s digital television services, forcing the Plaintiffs to develop

2    new smart card software to counter the Defendants' illegal activities, injuring the Plaintiffs'

3    relationships with actual and prospective customers, and depriving Plaintiffs of goodwill.

4    Defendants have also been unjustly enriched by their violations of the statute.

5        94.    Defendants' conduct has directly and proximately caused damages to the

6    Plaintiffs in an amount to be proven at trial.  In addition, the Plaintiffs' remedy at law is not

7    adequate.  Complete protection of the Plaintiffs' rights must include injunctive relief prohibiting

8    the Defendants from further violations of 47 U.S.C. Section 605 as provided by 47 U.S.C.

9    Section 605(e)(3)(B)(i), as well as all other remedies available.

10                        **PRAYER FOR RELIEF**

11        WHEREFORE, Plaintiffs pray for judgment in their favor as follows:

12    (a)    awarding injunctive relief to Plaintiffs prohibiting Defendants from contributing

13            to any acts of copying any of C+ Technologies' software code and prohibiting

14            Defendants from taking any steps to reverse engineer or otherwise violate the

15            security measures on any C+ Technologies smart card;

16    (b)    awarding damages for all injuries suffered as a result of Defendants' unlawful

17            conduct;

18    (c)    awarding treble damages pursuant to 18 U.S.C. Section 1964(c);

19    (d)    awarding disgorgement in an amount to be determined at trial and restitution as

20            appropriate;

21    (e)    awarding exemplary damages in an amount to be determined at trial;

22    (f)    awarding pre-judgment interest in an amount to be determined at trial;

23

24

25

26

27

28    / / /

1    (g)    awarding attorneys' fees and costs;

2    (h)    awarding such other relief as the Court may deem just and proper.

3

4    Dated:  August 20, 2002                    WILSON, SONSINI, GOODRICH & ROSATI

5

6                                               By:____/s/James A. DiBoise_____

7                                                       James A. DiBoise

8                                               Attorneys for Plaintiffs
                                                GROUPE CANAL+ S.A., CANAL+
9                                               TECHNOLOGIES S.A. and CANAL+
                                                TECHNOLOGIES, INC.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28